**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>DAVID ELLIOTT, an Individual;<br>CHRIS GILLESPIE, an Individual,<br><i>Plaintiffs-Appellants</i>,<br><br>v.<br><br>GOOGLE, INC., a Delaware<br>corporation,<br><i>Defendant-Appellee.</i></td><td>No. 15-15809<br><br>D.C. No.<br>2:12-cv-01072-<br>SMM<br><br>AMENDED<br>OPINION</td></tr>
</table>

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, District Judge, Presiding

Argued and Submitted March 17, 2017
San Francisco, California

Filed May 16, 2017
Amended June 14, 2017

Before: Richard C. Tallman and Paul J. Watford, Circuit
Judges, and Louis Guirola, Jr.,[*] Chief District Judge.

---

[*] The Honorable Louis Guirola, Jr., Chief United States District
Judge for the Southern District of Mississippi, sitting by designation.

Opinion by Judge Tallman;
Concurrence by Judge Watford

**SUMMARY**[**]

**Trademark Law**

The panel affirmed the district court's summary judgment in favor of Google, Inc., in an action under the Lanham Act, seeking cancellation of the GOOGLE trademark on the ground that it is generic.

The panel held that a claim of genericness or "genericide," where the public appropriates a trademark and uses it as a generic name for particular types of goods or services irrespective of its source, must be made with regard to a particular type of good or service. The district court thus correctly focused on internet search engines rather than the "act" of searching the internet. The panel also held that verb use of the word "google" to mean "search the internet," as opposed to adjective use, did not automatically constitute generic use. The panel affirmed the district court's conclusion that the plaintiffs' evidence was insufficient to establish that the primary significance of the word "google" to the relevant public was as a generic name for internet search engines, rather than as a mark identifying the Google search engine in particular.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Concurring, Judge Watford wrote that he joined the court's opinion with the caveat that the panel need not decide whether evidence of a trademark's "indiscriminate" verb use could ever tell a jury anything about whether the public primarily thinks of the mark as the generic name for a type of good or service.

## COUNSEL

Richard M. Wirtz (argued) and Erin K. Barns, Wirtz Law APC, San Diego, California; Thomas D. Foster, TD Foster – Intellectual Property Law, San Diego, California; for Plaintiffs-Appellants.

Angela L. Dunning (argued), Cooley LLP, Palo Alto, California; Peter J. Willsey, Cooley LLP, Washington, D.C.; for Defendant-Appellee.

## OPINION

TALLMAN, Circuit Judge:

I.

Between February 29, 2012, and March 10, 2012, Chris Gillespie used a domain name registrar to acquire 763 domain names that included the word "google." Each of these domain names paired the word "google" with some other term identifying a specific brand, person, or product—for example, "googledisney.com," "googlebarackobama. net," and "googlenewtvs.com."

Google, Inc. ("Google") objected to these registrations and promptly filed a complaint with the National Arbitration Forum ("NAF"), which has authority to decide certain domain name disputes under the registrar's terms of use. Google argued that the registrations violate the Uniform Domain Name Dispute Resolution Policy, which is included in the registrar's terms of use, and amount to domain name infringement, colloquially known as "cybersquatting." Specifically, Google argued that the domain names are confusingly similar to the GOOGLE trademark[1] and were registered in bad faith. The NAF agreed, and transferred the domain names to Google on May 10, 2012.

Shortly thereafter, David Elliott filed, and Gillespie later joined,[2] an action in the Arizona District Court. Elliott petitioned for cancellation of the GOOGLE trademark under the Lanham Act, which allows cancellation of a registered trademark if it is primarily understood as a "generic name for the goods or services, or a portion thereof, for which it is registered." 15 U.S.C. § 1064(3). Elliott petitioned for cancellation on the ground that the word "google" is primarily understood as "a generic term universally used to describe the act[] of internet searching."

On September 23, 2013, the parties filed cross-motions for summary judgment on the issue of genericness. Elliott requested summary judgment because (1) it is an

---

[1] Both the NAF case and the case at issue actually involve two separate trademark registrations—numbers 2884502 and 2806075. But because the parties agree that these two marks collectively refer to the Google search engine and related services, we refer to these marks collectively as the GOOGLE trademark.

[2] For the remainder of this opinion, we collectively refer to Appellants as "Elliott."

indisputable fact that a majority of the relevant public uses the word "google" as a verb—i.e., by saying "I googled it," and (2) verb use constitutes generic use as a matter of law. Google maintained that verb use does not automatically constitute generic use, and that Elliott failed to create even a triable issue of fact as to whether the GOOGLE trademark is generic. Specifically, Google argued that Elliott failed to present sufficient evidence to support a jury finding that the relevant public primarily understands the word "google" as a generic name for internet search engines. The district court agreed with Google and its framing of the relevant inquiry, and granted summary judgment in its favor.

Elliott raises two arguments on appeal. First, he argues that the district court misapplied the primary significance test and failed to recognize the importance of verb use. Second, he argues that the district court impermissibly weighed the evidence when it granted summary judgment for Google. We review the district court's grant of summary judgment de novo and ask, viewing the evidence in the light most favorable to Elliott, "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005) (citing *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001)). For the reasons described below, we reject both of Elliott's arguments and affirm summary judgment for Google.

## II.

We recognize four categories of terms with regard to potential trademark protection: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful terms. *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999) (quoting *Surgicenters of Am., Inc.*

*v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979)). This case involves the first and fourth categories, which lie at opposite ends of the spectrum with regard to protectability. At one extreme, generic terms are "common descriptive" names which identify only the type of good "of which the particular product or service is a species." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 718 F.2d 327, 329 (9th Cir. 1983), *rev'd on other grounds*, 469 U.S. 189 (1985). Generic terms are not protectable because they do not identify the source of a product. *Id.* At the other extreme, arbitrary or fanciful marks "employ words and phrases with no commonly understood connection to the product." *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1107 (9th Cir. 2016). Arbitrary or fanciful marks are "automatically entitled to protection because they naturally serve to identify a particular source of a product." *KP Permanent Make-Up, Inc.*, 408 F.3d at 602 (alterations omitted) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).

Over time, the holder of a valid trademark may become a "victim of 'genericide.'" *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 905 (9th Cir. 2007) (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 12:1 (4th ed. 1998) [hereinafter McCarthy]). Genericide occurs when the public appropriates a trademark and uses it as a generic name for particular types of goods or services irrespective of its source. For example, ASPIRIN, CELLOPHANE, and ESCALATOR were once protectable as arbitrary or fanciful marks because they were primarily understood as identifying the source of certain goods. But the public appropriated those marks and now primarily understands aspirin, cellophane, and escalator as generic names for those same goods. *See Bayer Co. v. United Drug Co.*, 272 F. 505, 510 (S.D.N.Y. 1921); *DuPont Cellophane*

*Co. v. Waxed Prods. Co.*, 85 F.2d 75, 82 (2d Cir. 1936); *Freecycle Network, Inc.*, 505 F.3d at 905. The original holders of the ASPIRIN, CELLOPHANE, and ESCALATOR marks are thus victims of genericide.

The question in any case alleging genericide is whether a trademark has taken the "fateful step" along the path to genericness. *Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 531 (7th Cir. 2003). The mere fact that the public sometimes uses a trademark as the name for a unique product does not immediately render the mark generic. *See* 15 U.S.C. § 1064(3). Instead, a trademark only becomes generic when the "primary significance of the registered mark to the relevant public" is as the name for a particular type of good or service irrespective of its source. *Id*.

We have often described this as a "who-are-you/what-are-you" test. *See Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 929 (9th Cir. 2005) (quoting *Filipino Yellow Pages, Inc.*, 198 F.3d at 1147). If the relevant public primarily understands a mark as describing "who" a particular good or service is, or where it comes from, then the mark is still valid. But if the relevant public primarily understands a mark as describing "what" the particular good or service is, then the mark has become generic. In sum, we ask whether "the primary significance of the term in the minds of the consuming public is [now] the product [and not] the producer." *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118 (1938).

## A.

On appeal, Elliott claims that he has presented sufficient evidence to create a triable issue of fact as to whether the GOOGLE trademark is generic, and that the district court erred when it granted summary judgment for Google. First,

he argues that the district court erred because it misapplied the primary significance test and failed to recognize the importance of verb use. Specifically, he argues that the district court erroneously framed the inquiry as whether the primary significance of the word "google" to the relevant public is as a generic name for internet search engines, or as a mark identifying the Google search engine in particular. Instead, Elliott argues that the court should have framed the inquiry as whether the relevant public primarily uses the word "google" as a verb.

We conclude that Elliott's proposed inquiry is fundamentally flawed for two reasons. First, Elliott fails to recognize that a claim of genericide must always relate to a particular type of good or service. Second, he erroneously assumes that verb use automatically constitutes generic use. For similar reasons, we conclude that the district court did not err in its formulation of the relevant inquiry under the primary significance test.

First, we take this opportunity to clarify that a claim of genericide or genericness must be made with regard to a particular type of good or service. We have not yet had occasion to articulate this requirement because parties usually present their claims in this manner sua sponte. *See, e.g.*, *KP Permanent Make-Up, Inc.*, 408 F.3d at 605 (claiming that "micro colors" is generic for micropigmentation services); *Filipino Yellow Pages, Inc.*, 198 F.3d at 1146 (claiming that "Filipino Yellow Pages" is generic for "telephone directories targeted at the Filipino-American community"); *Park 'N Fly, Inc.*, 718 F.2d at 330 (claiming that "Park 'N Fly" is generic for airport parking lots). But here, Elliott claims that the word "google" has become a generic name for "the act" of searching the internet, and argues that the district court erred when it

focused on internet search engines. We reject Elliott's criticism and conclude that the district court properly recognized the necessary and inherent link between a claim of genericide and a particular type of good or service.

This requirement is clear from the text of the Lanham Act, which allows a party to apply for cancellation of a trademark when it "becomes the generic name for the *goods or services* . . . for which it is registered." 15 U.S.C. § 1064(3) (emphasis added). The Lanham Act further provides that "[i]f the registered mark becomes the generic name for less than all of the *goods or services* for which it is registered, a petition to cancel the registration for only those *goods or services* may be filed." *Id.* (emphasis added). Finally, the Lanham Act specifies that the relevant question under the primary significance test is "whether the registered mark has become the generic name of [certain] *goods or services*." *Id.* (emphasis added). In this way, the Lanham Act plainly requires that a claim of genericide relate to a particular type of good or service.

We also note that such a requirement is necessary to maintain the viability of arbitrary marks as a protectable trademark category. By definition, an arbitrary mark is an existing word that is used to identify the source of a good with which the word otherwise has no logical connection. *See JL Beverage Co.*, 828 F.3d at 1107. If there were no requirement that a claim of genericide relate to a particular type of good, then a mark like IVORY, which is "arbitrary as applied to soap," could be cancelled outright because it is "generic when used to describe a product made from the tusks of elephants." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 n.6 (2d Cir. 1976). This is not how trademark law operates: Trademark law recognizes that a term may be unprotectable with regard to one type of good,

and protectable with regard to another type of good. In this way, the very existence of arbitrary marks as a valid trademark category supports our conclusion that a claim of genericide must relate to a particular type of good or service.

Second, Elliott's alternative inquiry fails because verb use does not automatically constitute generic use. Elliott claims that a word can only be used in a trademark sense when it is used as an adjective. He supports this claim by comparing the definitions of adjectives and trademarks, noting that both adjectives and trademarks serve descriptive functions.

Once again, Elliott's semantic argument contradicts fundamental principles underlying the protectability of trademarks. When Congress amended the Lanham Act to specify that the primary significance test applies to claims of genericide, it specifically acknowledged that a speaker might use a trademark as the name for a product, i.e., as a noun, and yet use the mark with a particular source in mind, i.e., as a trademark. It further explained that:

> A trademark can serve a dual function—that of [naming] a product while at the same time indicating its source. Admittedly, if a product is unique, it is more likely that the trademark adopted and used to identify that product will be used as if it were the identifying name of that product. But this is not conclusive of whether the mark is generic.

S. Rep. No. 98-627, at 5 (1984). In this way, Congress has instructed us that a speaker might use a trademark as a noun and still use the term in a source-identifying trademark sense.

Moreover, we have already implicitly rejected Elliott's theory that only adjective use constitutes trademark use. In *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250 (9th Cir. 1982), the Coca-Cola Company sued a local restaurant for trademark infringement because its servers regularly and surreptitiously replaced customer orders for "a coke" with a non-Coca-Cola beverage. *Id.* at 1252. The restaurant defended on the basis of genericide, arguing that the COKE trademark had become a generic name for all cola beverages. *Id.* at 1254. To support its claim, the restaurant presented employee affidavits stating that the employees believed that customers who ordered "a coke" were using the term in a generic sense. *Id.* We rejected these affidavits because they were not based on personal knowledge. More significant to the issue at hand, we also noted that the mere fact that customers ordered "a coke," i.e., used the mark as a noun, failed to show "what . . . customers [were] thinking," or whether they had a particular source in mind. *Id.* at 1255.

If Elliott were correct that a trademark can only perform its source-identifying function when it is used as an adjective, then we would not have cited a need for evidence regarding the customers' inner thought processes. Instead, the fact that the customers used the trademark as a noun and asked for "a coke" would prove that they had no particular source in mind. In this way, we have implicitly rejected Elliott's theory that a trademark can only serve a source-identifying function when it is used as an adjective.

For these reasons, the district court correctly rejected Elliott's theory that verb use automatically constitutes generic use.[3] Moreover, the district court aptly coined the

_____

[3] We acknowledge that if a trademark is used as an adjective, it will typically be easier to prove that the trademark is performing a source-

terms "discriminate verb" and "indiscriminate verb" in order to evaluate Elliott's proffered examples of verb use and determine whether they were also examples of generic use. Although novel, these terms properly frame the relevant inquiry as whether a speaker has a particular source in mind. We have already acknowledged that a customer might use the noun "coke" in an indiscriminate sense, with no particular cola beverage in mind; or in a discriminate sense, with a Coca-Cola beverage in mind. In the same way, we now recognize that an internet user might use the verb "google" in an indiscriminate sense, with no particular search engine in mind; or in a discriminate sense, with the Google search engine in mind.

Because a claim of genericide must relate to a particular type of good or service and because verb use does not necessarily constitute generic use, the district court did not err when it refused to frame its inquiry as whether the relevant public primarily uses the word "google" as a verb. Moreover, the district court correctly framed its inquiry as whether the primary significance of the word "google" to the relevant public is as a generic name for internet search engines or as a mark identifying the Google search engine in particular. We therefore evaluate Elliott's claim of genericide and the sufficiency of his proffered evidence under the proper inquiry.

---

identifying function. If a speaker asks for "a Kleenex tissue," it is quite clear that the speaker has a particular brand in mind. But we will not assume that a speaker has no brand in mind simply because he or she uses the trademark as a noun and asks for "a Kleenex." Instead, the party bearing the burden of proof must offer evidence to support a finding of generic use. *See* McCarthy § 12:8 ("The fact that buyers or users often call for or order a product by a [trademark] term does not necessarily prove that that term is being used as a 'generic name.'").

### B.

Elliott next argues that the district court must have impermissibly weighed the evidence when it granted summary judgment for Google in light of the "sheer quantity" of evidence that Elliott produced to support his claim of genericide. *See Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994) (noting that a court "must not weigh the evidence" at summary judgment). We disagree. Instead, we conclude that Elliott's admissible evidence is largely inapposite to the relevant inquiry under the primary significance test because Elliott ignores the fact that a claim of genericide must relate to a particular type of good or service.

A party applying for cancellation of a registered trademark bears the burden of proving genericide by a preponderance of the evidence. *Anti-Monopoly, Inc. v. Gen. Mills Fun Grp.*, 684 F.2d 1316, 1319 (9th Cir. 1982). Moreover, the holder of a registered trademark benefits from a presumption of validity and has "met its [initial] burden of demonstrating" the lack of "a genuine issue of material fact" regarding genericide. *Coca-Cola Co.*, 692 F.2d at 1254. Therefore, in light of the relevant inquiry under the primary significance test, Elliott was required to identify sufficient evidence to support a jury finding that the primary significance of the word "google" to the relevant public is as a name for internet search engines generally and not as a mark identifying the Google search engine in particular.

At summary judgment, the district court assumed that a majority of the public uses the verb "google" to refer to the act of "searching on the internet without regard to [the]

search engine used.”**⁴**   In other words, it assumed that a majority of the public uses the verb “google” in a generic and indiscriminate sense.  The district court then concluded that this fact, on its own, cannot support a jury finding of genericide under the primary significance test.  We agree.

As explained above, a claim of genericide must relate to a particular type of good.  Even if we assume that the public uses the verb “google” in a generic and indiscriminate sense, this tells us nothing about how the public primarily understands the word itself, irrespective of its grammatical function, with regard to internet search engines.   As explained below, we also agree that Elliott’s admissible evidence only supports the favorable but insufficient inference already drawn by the district court—that a majority of the public uses the verb “google” in a generic sense.   Standing in isolation,**⁵** this fact is insufficient to support a jury finding of genericide.   The district court therefore properly granted summary judgment for Google.

We begin with Elliott’s three consumer surveys. Consumer surveys may be used to support a claim of genericide “so long as they are conducted according to accepted principles.”  *Stuhlbarg Int’l Sales Co. v. John D.*

---

**⁴** In making this assumption, the district court drew a favorable (and generous) inference for Elliott.  As discussed above, verb use does not necessarily constitute generic use, yet most of Elliott’s proffered evidence relies on that theory.

**⁵** Contrary to our colleague’s suggestion, we do not hold that generic verb use is “categorically irrelevant.”  However, evidence that a mark is used in a generic sense in one particular setting cannot support a finding of genericide when it is unaccompanied by evidence regarding the primary significance of the mark as a whole.

*Brush & Co.*, 240 F.3d 832, 840 (9th Cir. 2001). Here, the district court properly excluded two of Elliott's consumer surveys because they were not conducted according to accepted principles. Specifically, these surveys were designed and conducted by Elliott's counsel, who is not qualified to design or interpret surveys. *See* Federal Judicial Center, Reference Manual on Scientific Evidence 364 (3d ed. 2011) (explaining that valid survey design typically requires graduate training or professional experience in survey research).[6]

The district court properly considered only Elliott's third survey, which was conducted by James Berger—a qualified survey expert. Elliott's third survey is a "Thermos" survey, which generally "puts the respondent in an imaginary situation . . . and asks how the respondent would ask" for the type of good for which the trademark is alleged to be generic. McCarthy § 12:15 (citing *Am. Thermos Prods. Co. v. Aladdin Indus.*, 207 F. Supp. 9, 21–22 (D. Conn. 1962), *aff'd*, 321 F.2d 577 (2d Cir. 1963)). Here, Berger asked 251 respondents: "If you were going to ask a friend to search for something on the Internet, what word or phrase would you use to tell him/her what you want him/her to do?" Over half of the 251 respondents answered this question by using the word "google" as a verb.

Although verb use does not automatically constitute generic use, the district court allowed Berger to rely on the

---

[6] The district court also correctly noted that, if the surveys were admitted, Elliott's counsel would need to withdraw in order to offer testimony on the survey results. *See* Ariz. R. Sup. Ct. 42, E.R. 3.7 ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness . . . .").

third survey to offer his expert "opinion that a majority of the public uses the word google as a [generic and indiscriminate] verb to mean search on the internet." In this way, Elliott's admissible consumer survey evidence goes no further than supporting the favorable inference already drawn by the district court.**[7]**

We next consider Elliott's examples of alleged generic use by the media and by consumers. Documented examples of generic use might support a claim of genericide if they reveal a prevailing public consensus regarding the primary significance of a registered trademark. *See* McCarthy § 12:13 (explaining that generic use by the media is a "strong indication of the general public's perception") (quoting *Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2d Cir. 1989)). However, if the parties offer competing examples of both generic and trademark use, this source of evidence is typically insufficient to prove genericide. *See id.*

---

**[7]** The district court also considered a fourth survey. Although Google already benefits from a presumption against genericide, *see Coca-Cola Co.*, 692 F.2d at 1254, Google offered a "Teflon" survey to prove that the GOOGLE mark is not generic. A Teflon survey begins with a brief lesson explaining the difference between brand names and common names. It then asks respondents to classify a series of words, including the trademark at issue, as either brand names or common names. *E. I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.*, 393 F. Supp. 502, 526–27 (E.D.N.Y. 1975). In response to Google's Teflon survey, a little over 93% of respondents classified "Google" as a brand name. Most respondents also classified "Coke," "Jello," "Amazon," and "Yahoo!" as brand names, and classified "Refrigerator," "Margarine," "Browser," and "Website" as common names. Unlike Elliott's Thermos survey, Google's Teflon survey offers comparative evidence as to how consumers primarily understand the word "google" irrespective of its grammatical function.

Initially, we note that Elliott's admissible examples are only examples of verb use. To repeat, verb use does not automatically constitute generic use. For instance, Elliott purports to offer an example of generic use by T-Pain, a popular rap music artist. But we will not assume that T-Pain is using the word "google" in a generic sense simply because he tells listeners to "google [his] name." T-Pain, *Bottlez*, *on* rEVOLVEr (RCA Records 2011). Without further evidence regarding T-Pain's inner thought process, we cannot tell whether he is using "google" in a discriminate or indiscriminate sense. In this way, many of Elliott's admissible examples do not even support the favorable inference that a majority of the relevant public uses the verb "google" in a generic sense.

Elliott also attempted to offer clear examples of indiscriminate verb use by the media and by consumers. For example, in response to Google's motion for summary judgment, he produced a transcript from an episode of a German television show in which a character claims to have "googled at Wikipedia." Elliott also produced examples in which the media uses phrases like "googled on ebay," "googled on facebook," and "googled on pinterest." Finally, Elliott produced evidence suggesting that certain consumers claimed that they accessed a website by "googling" it, even though those consumers actually accessed the website through a non-Google search engine.

The district court properly excluded these examples of indiscriminate verb use because they were not disclosed during discovery and because Elliott failed to show that his delay was "substantially justified or . . . harmless." Fed. R. Civ. P. 37(c)(1); *see also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("[W]e give particularly wide latitude to the district court's

discretion to issue [discovery] sanctions . . . ."). Moreover, even if these examples had been timely disclosed, they are largely irrelevant because they only support the favorable inference already drawn by the district court.

We next consider Elliott's proffered expert testimony. Each of Elliott's experts, including Dr. Berger, Dr. Patrick Farrell, and Dr. Allan Metcalf, opine that the word "google" is used in a generic sense when it is used as a verb.[8]  On its face, this testimony simply supports the favorable inference already drawn by the district court.

Next, we consider Elliott's proffered dictionary evidence.  *See* McCarthy § 12:13 (noting that dictionary definitions are "sometimes persuasive in determining public usage").  Elliott does not present any examples where "google" is defined as a generic name for internet search engines.  Instead, Elliott presents secondary definitions where google is defined as a verb.  *See, e.g.*, *Google*, CollinsEnglishDictionary.com, https://www.collinsdictiona ry.com/dictionary/english/google (last visited Apr. 15, 2017) (defining google primarily as a "trademark" but secondarily as a verb meaning "to search for (something on the internet) using a search engine"); *Google*, Dictionary.com, http://dictionary.reference.com/browse/go ogle (last visited Apr. 15, 2017) (defining google primarily as the "brand name of a leading Internet search engine" but secondarily as a verb meaning "to search the Internet for

---

[8] Elliott does not argue that these reports have any relevance beyond showing generic verb use.  Instead, Elliott attacks the credibility of Google's expert, Dr. Nunberg, and claims that the jury should be allowed to evaluate his credibility.  Elliott cannot carry his burden of proof by attacking the credibility of Google's experts.  Moreover, the district court properly rejected Elliott's attacks on Dr. Nunberg as unsubstantiated.

information about [something]").    Once again, Elliott's proffered dictionary evidence only supports the favorable inference already drawn by the district court.[9]

Next, we consider Elliott's claim that Google has used its own trademark in a generic sense.  Generic use of a mark by the holder of that mark can support a finding of genericide. *See* McCarthy § 12:13.  However, Elliott has not presented an example of generic use by Google.  Instead, Elliott has presented an email from Google cofounder Larry Page, which encourages recipients to "[h]ave fun and keep googling!"  Once again, Elliott relies on an example of verb use.  Elliott has not shown, nor is it likely that he could show, that the cofounder of Google had no particular search engine in mind when he told recipients of the "Google Friends Newsletter" to "keep googling."[10]

Finally, we consider Elliott's claim that there is no efficient alternative for the word "google" as a name for "the act" of searching the internet regardless of the search engine used.  Once again, a claim of genericide must relate to a particular type of good or service.  In order to show that there

---

[9] Elliott argues that these dictionaries only refer to the GOOGLE trademark because Google threatened to take legal action if the companies refused to acknowledge its registration.  Contrary to Elliott's assumption, Google's policing activities weigh against finding genericide.  *See, e.g.*, *Filipino Yellow Pages, Inc.*, 198 F.3d at 1151 (affirming lower court's reliance on plaintiff's lack of trademark policing as evidence that mark had become generic); *King-Seeley Thermos Co. v. Alladin Indus.*, 321 F.2d 577, 579 (2d Cir. 1963) (same).

[10] Elliott also argues that the email shows generic use because "googling" is not capitalized.  As we explained with regard to verb use and noun use, we cannot rely on grammatical formalism to determine what a speaker has in mind when using a registered trademark.  *See Coca-Cola Co.*, 692 F.2d at 1255.

is no efficient alternative for the word "google" as a generic term, Elliott must show that there is no way to describe "internet search engines" without calling them "googles." Because not a single competitor calls its search engine "a google," and because members of the consuming public recognize and refer to different "internet search engines," Elliott has not shown that there is no available substitute for the word "google" as a generic term. *Compare, e.g., Q-Tips, Inc. v. Johnson & Johnson*, 108 F. Supp. 845, 863 (D.N.J. 1952) (concluding that "medical swab" and "cotton-tipped applicator" are efficient alternatives for Q-Tips); *with Bayer Co.*, 272 F. at 505 (concluding that there is no efficient substitute for the generic term "aspirin" because consumers do not know the term "acetyl salicylic acid"); *see also Softbelly's Inc.*, 353 F.3d at 531 (explaining that genericide does not typically occur "until the trademark has gone so far toward becoming the exclusive descriptor of the product that sellers of competing brands cannot compete effectively without using the name").

Elliott cannot survive summary judgment based on "sheer quantity" of irrelevant evidence. We agree with the district court that, at best, Elliott has presented admissible evidence to support the inference that a majority of the relevant public uses the verb "google" in a generic sense. Because this fact alone cannot support a claim of genericide, the district court properly granted summary judgment for Google.

III.

The district court did not misapply the primary significance test, nor did it weigh the evidence when it granted summary judgment for Google. We agree that Elliott has failed to present sufficient evidence to support a jury finding that the relevant public primarily understands

the word "google" as a generic name for internet search engines and not as a mark identifying the Google search engine in particular. We therefore affirm the district court's grant of summary judgment.

Costs shall be taxed against Elliott. *See* Fed. R. App. P. 39(a)(2).

**AFFIRMED.**

---

WATFORD, Circuit Judge, concurring:

I join the court's well-reasoned opinion with one caveat. To resolve this appeal, we need not decide whether evidence of a trademark's "indiscriminate" verb use could ever tell us something about whether the public primarily thinks of the mark as the generic name for a type of good or service. Maj. op. at 13–14. To the extent the court's opinion can be read as taking a position on that question, I decline to join that aspect of its reasoning.

We don't need to resolve whether evidence of indiscriminate verb use is categorically irrelevant in an action alleging that a trademark has become generic because, on this record, no rational jury could find in the plaintiffs' favor even taking into account the flimsy evidence of indiscriminate verb use they produced. In support of its motion for summary judgment, Google produced overwhelming evidence that the public primarily understands the word "Google" as a trademark for its own search engine, not the name for search engines generally. In Google's consumer survey, 93% of respondents identified "Google" as a brand name, rather than a common name for search engines. In every dictionary in the record, the first

entry for "Google" or "google" refers to Google's search engine. Google extracted concessions from the plaintiffs' expert linguists that Google functions as a trademark for Google's search engine. Google also submitted evidence showing that it uses its trademark to refer only to its own search engine, that it polices infringement by others, and that its competitors refrain from using the trademark to refer to their own search engines. Finally, Google offered evidence showing that major media outlets use "Google" to refer exclusively to Google's search engine.

In response, the plaintiffs produced thousands of pages of largely irrelevant evidence showing merely that "google" is sometimes used as a verb. The sliver of potentially relevant evidence purporting to show that the public uses the verb "google" to refer to searching the Internet with any search engine (as opposed to Google's search engine in particular) is too insubstantial to save the plaintiffs' case. For example, the plaintiffs point to their Thermos survey, in which respondents were asked what word or phrase they would use to ask a friend to search for something on the Internet. Most respondents answered either "google," "google it," "google something," "google this," "google search," or "bring up google." However, those answers share the same problem that the court identifies with almost all of the plaintiffs' evidence, such as the rapper T-Pain's lyric telling his listeners to "google my name." That is, without more context, we simply can't tell whether the survey respondents were referring to searching the Internet with Google's search engine or with any search engine generally.

At most, with respect to evidence that the public employs the verb "google" without regard to the search engine used, the plaintiffs have mustered secondary definitions from a

few dictionaries and expert testimony from their linguists. Whatever this evidence might suggest about the use of "google" as a verb, no rational jury could rely on it to find, on this record, that the word has become the generic name for Internet search engines. As already mentioned, these dictionaries' primary definitions of the word uniformly refer to Google's own search engine. And the expert linguists conceded in their depositions that, despite their opinion that "google" is used in verb form without regard to a specific search engine, the term has not become a generic name for search engines.

There may never be a case that turns on evidence that a trademark is commonly used as a verb to refer to use of a type of good or service, as opposed to use of the particular product for which the trademark is registered. But if such a case were to arise, it's not obvious to me that a jury should be foreclosed from relying on the way the public uses the word as a verb to decide whether the public also thinks of the mark as the generic name for the type of good or service. The way we use words as verbs is often related to how we use those words as adjectives or nouns, such that evidence of indiscriminate verb use could potentially be relevant in deciding whether a trademark has become the generic name for a type of good or service. To the extent the court's opinion can be read to foreclose the consideration of such evidence as a matter of law, I decline to join it.